811 F.2d 605
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Cynthia GRANT, Plaintiff-Appellant,
v.
ROCKWELL INTERNATIONAL CORP., Defendant-Appellee.
 No. 85-1709.
 United States Court of Appeals, Sixth Circuit.
 Dec. 29, 1986.
 
 Before ENGEL, JONES and KRUPANSKY, Circuit Judges.
 PER CURIAM.
 
 
 1
 The plaintiff in this breach of contract and employment discrimination action appeals the district court's judgment for the defendant, Rockwell International Corporation ("Rockwell"). Cynthia Grant is a 37 year old black female. She was hired by the Universal Joint Division of Rockwell on September 6, 1978, for a position as a representative in the Inside Sales Department at Rockwell's automotive headquarters in Troy, Michigan. Grant's job responsibilities as Inside Sales representative were providing price quotations, answering sales inquiries and customer requests, writing and entering orders, researching parts, and supporting Outside Sales. At the time she was hired, Grant was interested primarily in a position in Outside Sales. Outside Sales involves calling on customers, traveling to different locations, soliciting orders, and servicing accounts.
 
 
 2
 Prior to joining Rockwell, Grant, who has a B.A. degree in journalism, had been employed by City National Bank in Detroit for five years. She and Rockwell were originally brought together by the LUDOT Agency, an employment agency that specializes in the placement of minority persons in jobs with business and industry. LUDOT set up an interview for Grant with Mr. Bencik, a personnel representative for Rockwell's Universal Joint Division. Grant understood from Bencik that the Inside Sales job was to be a training position that would lead to an Outside Sales position within one year. Bencik reportedly told her that sales was a stepping stone to management. Rockwell concedes that the Inside Sales job was a position that would qualify Grant for Outside Sales; however, it claims that no promises or commitments were made to Grant regarding promotion to Outside Sales. Grant's starting salary at Rockwell was $19,000. She was also given a benefit package that was considerably broader and better than that offered by the bank.
 
 
 3
 When Grant started to work at Rockwell, the Inside Sales Department consisted of Donald Rossi, the department supervisor, and Mark Willman and Judy Schultz, Inside Sales representatives. Schultz had been employed by Rockwell for about ten years, but she was a comparatively recent transfer to the Inside Sales Department, having worked previously primarily in a secretarial capacity. Willman had been in the Inside Sales Department for about one year before Grant joined the department. When Grant started the job she was reportedly told by Rossi that she would continue with the company as long as she did her job. She was trained by her two co-workers, Schultz and Willman.
 
 
 4
 In May 1979, Grant received her first performance evaluation, which included comments such as: "Cynthia is very dependable, and has shown all of the ambitiousness necessary for success in our sales group;" "Cynthia is promotable. Our plans are to have her continue in Sales, expanding exposure from pure paperwork to increased activity with customers as business permits and her background develops." She was given a rating at that time of "satisfactory" on a scale of performance ratings of outstanding, excellent, satisfactory plus, satisfactory, and unsatisfactory. Willman was also evaluated at that time and given a rating of "excellent". There is no evidence in the record about the evaluative report for Schultz.
 
 
 5
 Some time in the spring and into the early summer of 1979, Grant began to be dissatisfied with her job and with her lack of training for Outside Sales. On July 3, 1979, Grant requested a transfer to a different division or location in a memo to Rossi. Her memo stated in part: "Please consider this memo a formal transfer request.... When I agreed to accept this position, ... it was with the understanding that it would lead to an Outside Sales position. I now understand that the option of an Outside Sales position is not forthcoming in this division." She also notified the Personnel department of her desire for a transfer.
 
 
 6
 On October 10, 1979, Grant met with Bob Allen, Manager of Organization and Human Resource Planning at the Troy facility, in regard to her transfer request. Allen, a black male who was employed by Rockwell from 1979 to 1982, had overall responsibility for staffing. Because Grant's transfer request was unusual in that it went to Personnel as well as her supervisor, Rossi, Allen was specially assigned to deal with it. Allen talked to Rossi about the transfer request and concluded that there was some frustration on the part of both Rossi and Grant. He also concluded that Rossi was frustrated with Grant's job performance, and was having difficulty dealing with her as an employee. Allen also met with Grant. According to Allen, Grant indicated to him that her main interest in accepting the Inside Sales position was to use it as a vehicle to get into Outside Sales, and she no longer had any confidence that management would promote her to Outside Sales. Allen held a number of meetings with Rossi and Grant, together and separately, in an attempt to resolve the problems between them.
 
 
 7
 As a result of his involvement, Allen became convinced that there were some systematic and organizational problems in Inside Sales that were contributing to the controversy. Consequently, a decision was made to reorganize the department. Under the reorganization completed in November 1979, Grant would be the only Inside Sales representative. The reorganization was in part an attempt to provide Grant a more sales-oriented position. Under this plan, Grant would no longer be reporting to Rossi. Following the reorganization, Schultz left the department and returned to her previous secretarial position and Willman was transferred to Outside Sales.
 
 
 8
 Despite the reorganization, Grant still wanted to transfer out of Inside Sales. On November 8, 1979, she sent a letter to Rossi stating that: "I have given the reorganization of the Inside Sales area serious consideration. However, my request for a transfer to another division still stands...." In a letter from Rossi to Allen, dated November 8, 1979, Rossi stated that if Grant were successful in Inside Sales, her name would be submitted as the best candidate for the next Outside Sales opening. The letter further indicated that Grant's response to all of this was that she was still not sure that the Inside Sales job fit her career goals, and that she hadn't made the decision definitely to accept the position under the reorganization.
 
 
 9
 In another letter sent to Allen, also dated November 8, Rossi detailed a conversation that he had recently had with Grant:
 
 
 10
 Our conversation ran--"I want you to be a success inside, and then outside as well. If you are successful so will the rest of us be successful. Outside selling isn't easy. It will be hard for [Willman] (as young as he is), it will be harder for Kris Peters being a female, and even harder for you as a black female, but I know you can do it, and I am going to see to it it works.
 
 
 11
 App. at 201. Grant continued to press for a transfer through the month of November. On December 5, 1979, Rossi sent her a letter that stated, in part, that an attempt was being made to identify possible entry-level sales/marketing opportunities in other Rockwell locations for her. The letter also stated that there were no viable opportunities for her within the Universal Joint Division. The letter concluded that if the attempt to place her in another Rockwell location was unsuccessful, her employment would be terminated no later than December 31, 1979.
 
 
 12
 At about this time, Allen also began to make inquiries as to other entry level sales positions that might have been appropriate for Grant. While this search took place, Grant continued working in the revised sales job. Allen's search was unsuccessful in large part because Grant's background made her a potential job candidate in only one other division of Rockwell and there were no viable openings in that division. In early December, Allen met with Grant and told her that there were no transfer positions available, and that she would be kept on the payroll until the end of December. After this meeting, Grant was shown a performance review that indicated that her performance was "unsatisfactory." Allen also reportedly told Grant that her performance was disruptive.
 
 
 13
 The parties disagree over whether Grant resigned or was fired. Rockwell claims that her refusal to accept the revised Inside Sales position was in effect a resignation. Grant claims that she was fired. In any event, her employment terminated on December 7, 1979. On December 10, 1979, Allen drafted a memo to one of his superiors that stated that "we were unsuccessful in identifying opportunities in other Rockwell operations and coupled with the fact that Ms. Grant's performance and attitude continued to deteriorate we elected to sever her employment on Friday, December 7, 1979. We based the termination on the following...." This memo strongly suggests that Grant was, in fact, fired.
 
 
 14
 Following her termination, Grant commenced an action in Michigan state court in October 1982, alleging that Rockwell had breached an implied contract of employment by discharging her without cause. The action was subsequently removed to federal district court by Rockwell. After removal, Grant amended her complaint and added claims under Title VII of the Civil Rights Act, 42 U.S.C. Sec. 2000e et. seq. (1982), and the Elliott-Larsen Civil Rights Act, Mich.Comp.Laws Ann. Sec. 37.2101 et. seq. (West 1982), alleging that Rockwell had discriminated against her on the basis of race and sex by not promoting her, not training her and discharging her. The case was tried before Judge Ralph Guy in a bench trial. Judge Guy made findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure and entered judgment for Rockwell. The district court held that there was no implied contract of employment between Grant and Rockwell containing any provision for just cause termination. Alternatively, the court concluded that even if there had been an implied contract terminable for just cause, Rockwell had just cause. The court further held that Rockwell had not discriminated against Grant on the basis of her race or sex. Grant now appeals the district court's judgment.
 
 I.
 
 15
 The general rule in Michigan is that an employment contract for an indefinite term is terminable at will. Lynas v. Maxwell Farms, 273 N.W. 315 (Mich.1937). However, there are exceptions to this general rule. The most notable exception is the one advanced by the Michigan Supreme Court in Toussaint v. Blue Cross & Blue Shield, 292 N.W.2d 880 (Mich.1980), where the court recognized that an implied employment contract could provide for discharge only for just cause. The Toussaint court held that such an implied-in-fact contract could arise from written statements and oral assurances made by a company and its representatives to an employee. Blue Cross' personnel policy manual stated that it was company policy to discharge employees "for just cause only." Id. at 884. Additionally, the employee in Toussaint had been told after a specific inquiry that he would remain with the company "as long as [he] did [his] job." Id. Based on these representations, the court held that:
 
 
 16
 1) a provision of an employment contract providing that an employee shall not be discharged except for cause is legally enforceable....
 
 
 17
 2) such a provision may become part of the contract either by express agreement, oral or written, or as a result of an employee's legitimate expectations grounded in an employer's policy statements.
 
 
 18
 Id. at 885. The court went on to state that: "We hold only that an employer's express agreement to terminate only for cause, or statements of company policy and procedure to that effect, can give rise to rights enforceable in contract." Id. at 890.
 
 
 19
 The Michigan Supreme Court has recently noted that: "[t]he only right held in Toussaint to be enforceable was the right that arose out of the promise not to terminate except for cause." Valentine v. General American Credit, Inc., 362 N.W.2d 628, 629 (Mich.1984). Thus, in order for the Toussaint exception to apply, an employer must in some manner represent to an employee that its policy is to discharge only for just cause. In Schwartz v. Michigan Sugar Company, 308 N.W.2d 459 (Mich.App.1981), the court noted "that an employer's conduct and other pertinent circumstances may establish an unwritten 'common law' providing the equivalent of a just cause termination policy. Rules and understandings, promulgated and fostered by the employer, may justify a legitimate claim to continued employment." Id. at 462. The court cautioned, however, that "a mere subjective expectancy on the part of an employee will not create such a legitimate claim." Id.
 
 
 20
 On appeal, Grant argues that the district court erred by failing to consider a Rockwell policy known as the "Problem Solution Procedure" and her 90-day probationary period at the start of her employment in reaching its decision on her contract claim. The Problem Solution Procedure to which Grant cites is, in effect, a procedure by which internal corporate employee problems are resolved through a system of appeals beginning with the employee's immediate supervisor, then to a second level manager, and finally to the division vice president of personnel. This procedure was designed, in part, to implement Rockwell's "Open Door Policy", which provides that:
 
 
 21
 Should problems or misunderstandings arise, it is the policy of Automotive Operations that they be dealt with quickly, openly, and fairly and under no circumstances should an employee be reprimanded for appealing through the Automotive Operations Problem Solving Procedures.
 
 
 22
 App. at 184. Grant argues that the written problem resolution policy is the type of policy that the Michigan Supreme Court referred to in Toussaint when it held that an implied contract could be based on policy and procedure. A review of the documents cited by Grant reveals nothing that states or implies that an employee will be discharged only for cause. The simple fact that a company has policies and procedures applicable to its employees does not give rise to the conclusion that an employee may be discharged only for cause. See Kay v. United Technologies Corp., 757 F.2d 100 (6th Cir.1985). To give rise to an implied contract of employment, the policies must relate to job security. See Toussaint, 292 N.W.2d at 890. The policies cited by Grant are not the sort contemplated by the Michigan Supreme Court in Toussaint.
 
 
 23
 In arguing that her probationary period with Rockwell created an implied just cause contract, Grant relies on the case of Brewster v. Martin Marietta Aluminum Sales, Inc., 378 N.W.2d 558 (Mich.App.1985). In Brewster, the defendant company had placed an employee on probation in order to give her an opportunity to correct recent unsatisfactory job performance and insubordination. The court concluded that the probationary period, "among other things ... shows that defendants had established a policy pertaining to her by conduct and words to terminate only for just cause upon which she could rely." Id. at 565. The holding of Brewster is quite narrow. The court clearly did not hold that a uniform probationary period imposed on all new employees creates a contract of employment terminable only for just cause. Grant nonetheless argues that if the probationary period is one in which an employee can be discharged for any cause, then the permanent employment period that follows must logically contain a termination for good cause only assurance. Grant, however, cites no Michigan law in support of this contention, and we find no authority for the proposition that the existence of a probationary period without anything else establishes a just cause contract. Therefore, we conclude that Grant's probationary period did not create an implied just cause contract. The district court's conclusion on this point is supported by the facts and is not clearly erroneous.[1]
 
 II.
 
 24
 The district court also concluded that Grant had not been discriminated against in terms of promotion or training and that the reorganization of the Inside Sales Department was not pretextual. Grant argues that these findings are in error. A district court's "[f]indings of fact ... shall not be set aside unless clearly erroneous." Fed.R.Civ.P. 52(a). A district court's findings of fact will be deemed clearly erroneous on review only if, after reviewing the entire record, the appellate court "is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948).
 
 
 25
 Grant first argues that the district court erred in its determination that she had not established a prima facie case under her employment discrimination claim. Specifically, Grant contends that the district court's failure to consider Michigan Standard Jury Instruction 105.02[2], or the decision in Brewster v. Martin Marietta Aluminum Sales, Inc.,[3] 378 N.W.2d 558 (1985), was erroneous. This argument is without merit. Brewster was decided in 1985, after the district court decided this case. Therefore, the court could not have considered it in reaching its conclusion. Additionally, Brewster does not change the standards of proof set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981). Finally, the district court clearly set forth the requirements of McDonnell-Douglas in its opinion and properly analyzed Grant's claim as required by current state and federal law.
 
 
 26
 Grant next argues that the district court erred in finding that Rockwell's failure to promote her to Outside Sales was not discriminatory. The district court concluded that Willman was promoted over Grant because: 1) he had been employed by Rockwell longer; 2) he was better qualified; 3) he had better product knowledge; and 4) his job performance was rated "excellent" while hers was rated "satisfactory." The record amply supports this conclusion. There is no evidence suggesting that Grant was denied the promotion because of her race or sex. In fact, there is a great deal of evidence to support the court's conclusion that Willman was promoted over her because he was better qualified.
 
 
 27
 Grant also argues that the district court did not consider Rossi's statement that she would have a hard time in Outside Sales because she was a black female. A fair reading of that statement, however, suggests that Rossi was describing the prejudices and difficulties that all three individuals might encounter. The statement does not support the conclusion that Rossi was personally prejudiced against Grant because of her race, and denied her a promotion for that reason.
 
 
 28
 Additionally, Grant assigns error to the district court's conclusion that the reorganization of the Inside Sales Department was not pretextual. Grant contends that the fact that the reorganization did not make her a more viable candidate for Outside Sales and did not add anything new to her job, "makes it impossible to rationalize the court's finding that the reorganization was not pretextual." The court's finding is supported by the evidence. In fact, it appears that the reorganization did make her a more viable candidate for an Outside Sales job because: 1) she would have been the only Inside Sales representative; and 2) the record contains evidence to the effect that an Inside Sales representative who performed well would be considered for an Outside Sales position.
 
 
 29
 Grant's final claim is that the trial court's conclusion that the efforts to transfer her were not pretextual is clearly erroneous. Grant maintains that Rockwell did not make enough of an effort to transfer her. However, the record is clear that a good faith effort was made to transfer her. It is also clear from the record that there were no open positions for which Grant was qualified. Grant presented no evidence in the district court challenging the sincerity of the efforts to transfer her. Therefore, the district court's conclusion is not clearly erroneous.
 
 
 30
 For the reasons set forth in this opinion, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 Grant also claims that the defendant's attempt to characterize her discharge as a resignation leads to an inference that she could be terminated only for good cause. The record does support Grant's claim that she was discharged and did not resign. However, the fact that Rockwell claims that she resigned, when she was in fact discharged, does not necessarily lead to the inference that Grant could be terminated only for cause
 
 
 [2]
 SJI 105.02 provides, in part, that:
 Sex does not have to be the only reason, or even the main reason, but it does have to be one of the reasons which made a difference in determining whether or not to discharge the plaintiff.
 
 
 [3]
 The relevant part of Brewster states that "to establish a prima facie case under this method, the plaintiff had to prove that she was discharged and that the individual (defendant) discharging her was predisposed to discriminate against females and had acted on the predisposition in discharging her." 378 N.W.2d at 563