Jeffrey William COLE and Danielle Cole, Plaintiffs,

v.

KNOLL, INC., Defendant.

No. 1:96 cv 836.

United States District Court,
W.D. Michigan,
Southern Division.

Oct. 7, 1997.

Eugenie Bauman Eardley, Eardley Law Offices, P.C., Grand Rapids, MI, for Plaintiff.

Timothy J. Ryan, Miller, Johnson, Snell & Cummiskey Grand Rapids, MI, for Defendant.

## *OPINION*

SCOVILLE, United States Magistrate Judge.

This is an action brought by Jeffrey Cole and Danielle Cole against Jeffrey Cole's former employer Knoll, Inc. for wrongful termination of his employment. Plaintiffs initially filed this action in Kent County Circuit Court. Defendant removed the case to this court pursuant to 28 U.S.C. § 1441 on the basis both of federal question jurisdiction and of diversity and the requisite amount in controversy. 28 U.S.C. §§ 1331, 1332.

Plaintiffs' complaint asserts that Mr. Cole's discharge from employment violated his rights against race and sex discrimination under both Title VII of the federal Civil Rights Act of 1964 and the analogous Michigan Elliott–Larsen Civil Rights Act, and his rights under an implied employment contract under state law. They also asserts claims for promissory estoppel, libel, slander, intentional infliction of emotional distress, and loss of consortium. The matter is now before me on defendant's motion for summary judgment (docket # 24). The parties have agreed to the exercise of case-dispositive jurisdiction by a magistrate judge (docket # 9). 28 U.S.C. § 636(c). For the reasons set forth below, defendant's motion for summary judgment will be granted.

### *Applicable Standard*

As the Sixth Circuit has noted, the federal courts have entered a "new era" in summary judgment practice. *Cox v. Kentucky Dep't of Transp.,* 53 F.3d 146, 150 (6th Cir.1995); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478–81 (6th Cir.1989). While preserving the constitutional right of civil litigants to a trial on meritorious claims, the courts are now vigilant to weed out unsupported claims before trial. Summary judgment is appropriate when the record reveals that there are no issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Sable v. General Motors Corp.,* 90 F.3d 171, 175 (6th Cir.1996); *Payne v. Board of Education,* 88 F.3d 392, 397 (6th Cir.1996) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986)). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

*See Adcox v. Teledyne, Inc.,* 21 F.3d 1381, 1385 (6th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 193, 130 L.Ed.2d 126 (1994) (quoting *Anderson v, Liberty Lobby, Inc.,* 477 U.S. at 251–52, 106 S.Ct. at 2511–12).

The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The party moving for summary judgment bears the initial burden of pointing out to the district court that there is an absence of evidence to support the nonmoving party's case, but need not support its motion with affidavits or other materials "negating" the opponent's claim. *Moore v. Philip Morris Companies, Inc.,* 8 F.3d 335, 339 (6th Cir.1993). Once defendants show that "there is an absence of evidence to support the nonmoving party's case," plaintiff his the burden of coming forward with evidence raising a triable issue of fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). To sustain this burden, plaintiff may not rest on the mere allegations of his pleadings. FED. R. CIV. P. 56(e); *Copeland v. Machulis,* 57 F.3d 476, 479 (6th Cir.1995); *Cox,* 53 F.3d at 150. A party opposing a motion for summary judgment has the burden to come forth with requisite proof to support his legal claim, particularly where he has had an opportunity to conduct discovery. *See Noble v. Chrysler Motors Corp.,* 32 F.3d 997, 999 (6th Cir. 1994); *Street v. J.C. Bradford & Co.,* 886 F.2d at 1478–81; *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1310 (6th Cir.1989). In so doing, plaintiff must set forth *specific facts* showing that there is a genuine issue for trial. FED. R.CIV.P. 56(e); *see Kensu v. Haigh,* 87 F.3d 172, 175 (1996); *Brennan v. Township of Northville,* 78 F.3d 1152, 1156 (6th Cir.1996). The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1355.

■ Even though plaintiffs bring several claims under Michigan law, the federal summary judgment standard nevertheless applies. *See Reid v. Sears, Roebuck & Co.,* 790 F.2d 453, 459 (6th Cir.1986) (claims of wrongful discharge under Michigan law governed by Rule 56 standards arid not Michigan law); *accord, Gafford v. General Elec. Co.,* 997 F.2d 150, 165–66 (6th Cir.1993). Consequently, plaintiff's reliance on the somewhat more lenient summary judgment standard applied by the Michigan courts must be rejected, in favor of a faithful application of federal standards. Applying these standards, the court determines that defendant's motion for summary judgment should be granted as to all claims.

### *Discussion*

### I. Findings of Fact

The following facts, with all inferences drawn in plaintiffs' favor, are beyond genuine issue. Defendant is a Delaware corporation with its principal place of business in East Greenville, Pennsylvania. Defendant owns and operates a factory located at 4300 36th Street, S.E., Grand Rapids, Michigan. Jeffrey Cole, a white male, was employed by defendant at this location for a six-month period, from October of 1995 to April of 1996.

*Contract Claim*

Plaintiff[1] had his initial job interview with defendant in the fall of 1995. Plaintiff was interviewing for a temporary hourly position. Ron Termolen was a second shift manager for defendant at that time (Termolen Aff., ¶ 3, docket # 28). Termolen interviewed plaintiff and others for a the temporary hourly position (Termolen Dep., Ex. C, at 7, docket # 28; Plf. Dep. at 32–37, docket # 33). Plaintiff's resume reflected his work history as a personnel manager for the United States Army (Ex. A, docket # 28). Termolen asked plaintiff why he was looking for work in a factory, when his resume did not reflect any history of factory work. Plaintiff responded that he was looking for some extra Christmas money (Plf. Dep. at 35). Plaintiff was on a ninety-day leave from the

---

1. This opinion will use the term "plaintiff" to refer to Jeffrey Cole. The claims of his wife

Danielle are completely derivative.

Army with a ninety-day window for reenlistment (Plf. Dep. at 16, 22, 28). Defendant was generally looking for hourly employees, but also asked its interviewers to look for candidates suitable to hold supervisory positions (Termolen Dep. at 8). Termolen identified plaintiff as a possible candidate for a supervisory position. Termolen inquired if plaintiff might be interested in a supervisory position (Plf. Dep. at 35). Plaintiff responded that he was "always listening ... always willing to listen to someone." (Plf. Dep. at 36). Termolen did not relay any information about the terms or conditions of the salaried position, but did request that plaintiff drop off an extra copy of his resume to the human resources department (Plf. Dep. at 36, 47). Termolen made no representation to plaintiff that he could expect any job security in the temporary hourly position (Plf. Dep. at 33–39). Plaintiff was contacted for a second interview (Plf. Dep. at 41).

Termolen relayed plaintiffs name as a possible supervisor to Leendert Ringlever. The temporary supervisor position reported to Ringlever (Termolen Dep. at 12–13). Ringlever interviewed plaintiff and several other candidates for the temporary supervisor position (*Id.* at 16; Plf. Dep. at 45). The day after this interview, plaintiff received a telephone call from Brenda Moon, advising plaintiff that he would be hired as a temporary hourly employee through Adia Employment Agency at $25.00 per hour (Plf. Dep. at 48). Plaintiff began work as a temporary supervisor at Knoll on October 16, 1995 (Ex. A, docket # 28; Plf. Dep. at 52). Plaintiff understood that he was not represented by the union or covered under the union contract (Plf. Dep. at 59).

Some time thereafter, Termolen and others interviewed plaintiff as part of the process of making him a regular rather than a temporary employee (Termolen Dep. at 21; Plf. dep. at 69) Termolen, Brenda Moon, John Pfaendtner and Phil Baker were the group of interviewers seated around a conference table (Plf. Dep. at 69). Termolen did not give plaintiff any handbook or written policy, did not inform him that he was an at-will employee and did not advise plaintiff of any probationary period (Termolen Aff., ¶ 5).

Plaintiff testified at length concerning this and other meetings and the representations (or had thereof) made to him concerning his job security as a permanent employee:

Q Did—during this meeting were you offered the regular full-time position with Knoll?

A No.

Q Were wages and benefits discussed at all?

A No.

Q Were there any other terms and conditions of your employment discussed at all?

A No.

Q No?

A No.

Q All right. When's the next time you had a discussion with anyone about obtaining a regular position with Knoll?

A A few days later, Leo [Ringlever] called me up to his office somewhere around 7:00 and offered me a salary and a permanent position with Knoll.

Q That would be 7:00 in the evening?

A Correct.

Q Was there anyone else in the office at that time?

A No.

Q Okay, I want you to tell me again, in as much detail as you can recall, what it was that Mr. Ring Lever told you during that meeting.

A He called me in and he sat me down and told me that I had been doing a very good job for Knoll. He told me he liked the aggressiveness in which I went out to try to perform the job. He told me that he had noticed beginning in early— he believed that I was doing a fine job and offered me a salary.

Q Tell you what the salary would be?

A Forty thousand eight hundred dollars a year. And he explained to me that there was a benefit package and that kind of thing that went along with it.

Q Did he tell you what the benefits would be?

A No. He told me that would be covered should I accept, that that would be covered with an appointment with human resources.

Q Okay. What else did you and he talk about?

A He asked me if I wanted it.

Q And what did you say?

A I told him I had to make a phone call.

Q Okay. Now was there any other discussion at this meeting?

A Oh, it was pretty cut and dried. You either want it or you don't.

Q All right. Did he say go ahead and make the phone call now, or—

A I had to call my wife and ask her.

Q Okay, so right then, during that meeting, you discussed with him the phone call?

A Yes.

Q. Did you make the call with Mr. Ringlever sitting there?

A. No.

Q Did he leave the room?

A I left the room.

Q Okay, you went and made a phone call to your wife, and you told her what?

A It was a big decision. I had been in the service for over twelve years, it was a big career step for me. It was a scary time. You—when you're with a particular place for a certain amount of time, you get comfortable.

I was comfortable in the military. I was going places in the military. I was ahead of my peer group. Things were going well. And to start off on a new leg, a new journey and a new course of action was something that I wanted to make sure that she knew what I was going to be facing, and if that was something that she wanted to deal with.

Q Okay, so did you and she discuss all that—the things you've just talked about?

A Not all on the phone. We had discussed it—we had discussed it earlier. It was more of a—I want to do this. You with me on this,

Q Okay, you called and told her you had been offered the job?

A Right.

Q And you told her that—what the salary was?

A Right. She asked me.

Q And you told her you wanted to do it?

A If she did, yes.

Q You told her that you were in favor of taking the job?

A Yes.

Q But you wanted to know what she thought about it?

A Correct.

Q And what did she say?

A She said go ahead.

Q And did you go back and tell Mr. Ringlever that you accepted?

A Yes.

Q And what happened—you went back to his office, I take it?

A Yes.

Q And was there any other discussion at that time in his office?

A No. He pretty much shook my hand and told me to keep up the good work.

(Plf. Dep. at 72–76, docket # 33).

Ringlever's affidavits also reflect that plaintiff was never advised at the time Ringlever offered him the job that plaintiff had a job as long as he did it well (Ringlever Aff., ¶ 4, Ex. D, docket # 28; Ringlever Aff., ¶ 3, docket # 32). Plaintiff began work as a salaried manufacturing supervisor with defendant on December 1, 1995 (Ex. A, docket # 28). Sometime after plaintiff accepted the position as a regular full time employee and had begun working at that position, Ringlever did make statements to plaintiff to the effect that plaintiff had a job as long as he did it well. These statements were never part of the negotiations with plaintiff concerning his employment (Ringlever Aff., ¶ 3, docket # 32).

Plaintiff made plans to buy a house and leave his military position after he received the regular position with defendant. Plaintiff asked Ringlever if he was secure enough in his position that he could do these things safely. Ringlever assured plaintiff that as long as he did his job adequately he would be alright (Ringlever Aff., ¶ 8, docket # 8). But supervisor's statements never matured beyond such vague assurances:

Q During your entire period with Knoll, whether as a temporary employee or as a direct employee, did you ever have any discussions with anybody about the cir-

cumstances under which you might be disciplined or discharged?

A No.

(Plf. Dep. at 80).

Plaintiff's deposition did not identify any representation by Ringlever or anyone else prior to plaintiff's accepting of the position that he would have the position as long as he performed his job adequately. Plaintiff's deposition testimony was unambiguous. Plaintiff nevertheless, asserts, in a subsequent affidavit, that had he known that the policy was at-will employment, he would not have taken the job, would not have left his military position or purchased a new house (J. Cole Aff., docket # 28, ¶ 4). Even so, plaintiff's affidavit does not aver that any supervisor told him that he had a secure job terminable only for cause or that defendant in any other way created this expectation.

Plaintiff worked the second shift during his entire period of employment with defendant, whether through the employment agency or as a direct employee of defendant. After plaintiff became a regular employee, there was no change in his job duties. He remained on second shift and Mr. Ringlever remained his direct supervisor (Plf. Dep. at 78).

Q Now did you ever have a discussion with Mr. Ringlever about circumstances under which you might be disciplined or discharged?

A No.

Q Did you ever have a discussion with Rick Vales about the circumstances under which you might be discharged and disciplined?

A No.

Q Did you ever have conversation with Mac McElroy about the circumstances under which you might be—your employment might be terminated or you might be—

A No.

Q All right, during your—the entire period of time you were at Knoll, while you were a temporary employee or while you were a full-time employee, did you have any discussions with Mr. Ringlever about the circumstances under which you might be—your employment might be terminated or you might be disciplined?

A No. Mr. Ringlever was terminated before me

Q Did you ever, again during this entire period at Knoll, did you ever have discussions about the circumstances under which you might be disciplined or discharged with Rick Vales?

A No.

Q And not with Mac McElroy either?

A No.

Q . . . During your entire period with Knoll, whether as a temporary employee or as a direct employee, did you ever have discussions with anybody about the circumstances under which you might be disciplined or discharged?

A No.

(Plf. Dep. at 78–80). Plaintiff's counsel also questioned plaintiff and he again confirmed that no one at defendant advised plaintiff of any specific discipline policy that would be followed with respect to employment termination (Plf. Dep. at 180).

Antoinette "Toni" Campbell was plaintiff's supervisor (Campbell Dep. at 6, Ex. F, docket # 2 8). She testified that union stewards approached her and advised her that one of the hourly employees had a problem with somebody touching her stomach. Campbell met that night with Tammy Tucker in Campbell's office. Tucker indicated that while she had been talking with plaintiff he reached down and put his hand on her stomach. Tucker indicated that she felt harassed and wanted it to stop (Campbell Dep. at 8). Plaintiff denied touching Tucker, and Tucker elected not to pursue the matter further (Campbell Dep. at 9). In another incident, a Keli Klein allegedly cut her finger and she held it up to show plaintiff. He purportedly responded by stating, "No thank you; I'm married." Again, the incident was reported to Campbell through a union steward (Campbell Dep. at 10–11). Following these incidents, Campbell moved plaintiff to another department (Campbell Dep. at 18).

While plaintiff was supervising the welding area he had a confrontation with Doris Jones, an African American woman. Union representative Brian Cantrell brought the situation to Campbell's attention (Campbell Dep.

at 18). Plaintiff had confronted Jones about not being honest about the number of frames she had welded (Campbell Dep. at 19). Efforts to set up a meeting between Jones and plaintiff and union steward Cantrell failed to materialize. When plaintiff tried to talk with Jones she refused to speak with him. She wanted to see her union representative. Jones stormed off to look for her union steward. Allegations were leveled by Jones that plaintiff grabbed her on the arm and called her a liar (Campbell Dep. at 20, 30). Doris Jones went up to Human Resources Director, J.R. "Mac" McElroy's office (Campbell Dep. at 21). McElroy called Campbell to his office. McElroy advised Campbell to have a meeting with plaintiff, Jones and the union steward (Campbell Dep. at 23).

A meeting was held that night, April 10, 1997, in Campbell's office at which these four individuals were present. Campbell made fragmentary handwritten notes at the meeting (Campbell Dep. at 24). Among other things, Jones expressed a belief that plaintiff was out to get her fired and made improper comments to women workers. Plaintiff indicated that he was not after Jones and would do whatever was necessary to resolve the situation. It was determined at the conclusion of the meeting that plaintiff would remain the supervisor and that when plaintiff would address Jones, a third person would be present to monitor the conversation (Campbell Dep. at 31).

Subsequently, there was a meeting or meetings between Campbell, McElroy and Phillip Baker, the manufacturing manager for the plant (Campbell Dep. at 36). Other problems with plaintiff's performance were discussed (Baker Dep. at 10–23, 54). An incident was discussed where plaintiff allegedly threw his pager, his radio and glasses down on the floor and left the building (Campbell Dep. at 37–41). Also discussed was plaintiff's playing chess with an hourly employee in the maintenance department during working hours (Campbell Dep. at 42). The discussion included a number of topics: the alleged touching of Ms. Tucker's stomach (Campbell Dep. at 44); the incident involving the bleeding finger (Campbell Dep. at 48); an obscene gesture plaintiff had allegedly made to Ms. Jones (Campbell Dep. at 55); and the alcohol plaintiff brought onto compa-

ny property and offered by plaintiff to Mr Vales (Baker Dep. at 53–55). The group decided that plaintiff's employment with defendant would be terminated (Campbell Dep at 44). Human Resources Director, J.R. McElroy was involved in the decision to terminate plaintiff's employment Plaintiff was a non-union salaried employee. McElroy states that it is defendant's policy to employ non-union salaried employees at its Grand Rapids plant on an at-will basis and that policy was in effect during plaintiff's employment with defendant and applied to plaintiff (McElroy Aff., ¶ 3, docket # 24). Among the comments and conduct considered prior to plaintiff's termination included the following: (1) an obscene gesture towards Delores Jones, an African–American woman; (2) advising Delores Jones that his "wife's butt is so tight it could crack walnuts;" (3) asking Delores Jones to give his telephone number to another woman (a non-employee and not plaintiff's wife) whom he and Jones both knew, and to ask this other woman to call him; (4) rubbing employee Tammy Tucker on her stomach; (5) references to employee Marianne Fatalia as his "favorite;" (6) plaintiffs purported response, "no thanks, I'm married," when employee Kelly Klein cut her finger and showed it to plaintiff in the course of obtaining medical treatment; (7) playing chess with hourly employee Ruben Allegue in the work area and during Allegue's work time; (8) bringing alcohol onto defendant's premises in violation of company policy and offering same to defendant's Vice President Rick Vales; and (9) plaintiff's throwing down his badge and keys on a table and walking out during the shift (McElroy Aff., ¶ 3).

Plaintiff was terminated on April 12, 1996 (Plf. Dep. at 80).

*Race and Sex Discrimination*

Plaintiff stated that he believes he was fired because Doris Jones, an African–American woman, threatened to make further complaints against the company (Plf. Dep at 139). Plaintiff has no other basis for asserting either gender or race based discrimination (Plf. Dep. at 13940). Plaintiff never filed an administrative charge with the EEOC or the Michigan Department of Civil Rights (Plf. Dep at 97).

*Libel and Slander*

Plaintiff believes that Toni Campbell made a derogatory comment to Mariane Faitalia. Plaintiff is unaware what Campbell specifically had stated to Faitalia. Plaintiff simply believes that Campbell discussed "the Doris Jones incident" with Faitalia (Plf. Dep. at 14647, 150–51). Plaintiff could not identify any facts leading him to believe that Campbell knowingly made false statements to Faitalia about the Jones incident (Plf. Dep. at 151). Campbell testified that at a meeting with Baker and McElroy she was asked to go out and speak with Faitalia because Doris Jones had identified Faitalia as another female employee having problems with plaintiff. Faitalia advised Campbell that plaintiff would single her out. Plaintiff allegedly would and refer to Faitalia as his favorite, despite Faitalia's requests to desist, making Faitalia uncomfortable (Campbell Dep. at 57).

Plaintiff also expressed his belief that Campbell made statements to Mariane Doherty. Again plaintiff suspected that the conversation concerned the "Doris Jones incident." (Plf. Dep. at 147–49). Plaintiff stated that he had a conversation with Doherty. Doherty "said that Toni was asking a lot of questions, and giving her some information that Mary had said didn't put me in a very good light." (Plf. Dep. at 150). Plaintiff also believed that Toni Campbell had discussed the Jones incident with Brian Cantrell. Plaintiff had no specific knowledge about what Campbell said to Cantrell. Again, plaintiff was unable to identify any facts forming the basis for a belief that whatever Campbell said was untrue (Plf. Dep. at 151). Plaintiff did not assert that any member of defendant's management had defamed him (Plf. Dep. at 152).

A copy of one page of Toni Campbell's investigation notes was found on the shop floor (Plf. Dep. at 152–53). Plaintiff located a page from the notes on the floor underneath one of the rolling tables in the welding department (Plf. Dep. at 153–54). Plaintiff had no evidence of publication to anyone other than himself (Plf. Dep, at 153).

*Intentional Infliction of Emotional Distress*

Plaintiff was questioned regarding the specific conduct by defendant's management that was outrageous and extreme and beyond all possible bounds of common decency.

Q Okay, you also have an allegation in your complaint that Knoll's management employee's conduct toward you is outrageous and character extreme a degree and beyond all possible grounds of common decency. I want you to tell me everything that members of the Knoll management did to you that you believe falls under that description of conduct?

A The way I was treated by my supervisor, I was never dealt with directly after this incident.

Q After the Doris Jones incident you're talking about?

A Right. And even the Rubin Allegue chess playing incident. Instead of my supervisor coming to me and asking me what was going on, what the problem was—

Q Who is your—who was your supervisor?

A Toni Campbell at that time. She went behind me and put her facts, figures together, made her own determination, and then presented me with—then would ask me what my story was, I guess to try to catch me in a lie. I never gave anybody a reason to do that.

Q Okay, so one of the things that you believe constituted outrageous and extreme behavior beyond all possible bounds of decency was that Toni Campbell went and investigated these incidents we've talked about?

A The union knew more about what was going on than I did.

Q Anything else?

A No.

(Plf. Dep. at 157–58).

*Promissory Estoppel*

Plaintiff alleges that after he became a regular rather than a temporary employee of defendant members of defendant's management were aware that he was purchasing a house on a land contract. (Plf. Dep. at 158, 165). Plaintiff states that he told Campbell that he was thinking of buying a house, and that she responded, "Great," and told plaintiff a story about having been to that resi-

dence in the past (Plf. Dep. at 165; Campbell Dep. at 48). Plaintiff also told Gary Herman about the house. Plaintiff discussed possible future raises with Campbell (Plf. Dep. at 166–67). Plaintiff told Leo Ringlever, "Boy, I hope I'll be able to continue to make this payment." He responded with something to the effect "Yep, don't worry about it. You should be okay." (Plf. Dep. at 166). Plaintiff stated to Phil Baker, "Now I hope I'm going to be able to continue the [sic] make this payment. I hope nothing happens, because I heard rumblings about that we were getting sold, that the corporation was up for sale." (Plf. Dep. at 168). Baker purportedly responded "you're doing a good job" and told plaintiff not to be concerned with the sale of the company (Plf. Dep. at 168).

### Discussion

### I. Race and Sex Discrimination under Title VII

 Plaintiff's only federal claim is for race and sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17. "Timely filing an EEOC complaint is a prerequisite to a Title VII suit." *EEOC v, Wilson Metal Casket Co.*, 24 F.3d 836, 839 (6th Cir.1994); see *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798, 93 S.Ct. 1817, 1822, 36 L.Ed.2d 668 (1973); 42 U.S.C. § 2000e–5(e). While normally the EEOC complaint must be filed within 180 days of the complained of acts of discrimination, the time may be extended to 300 days if complaint is made to the Michigan Department of Civil Rights. 42 U.S.C. § 2000e–5(e); *see also Dircken v. State of Michigan*, No. 93–2545, 1994 WL 443499, at * 1 (6th Cir. Aug.16, 1994) ("In a deferral state such as Michigan, a charge of discriminatory conduct must be filed with the EEOC within 300 days after the alleged unlawful conduct occurs."). Plaintiff admits that he never filed a discrimination claim against defendant with the Michigan Department of Civil Rights or the EEOC concerning his employment termination. He is therefore legally foreclosed from bringing a Title VII action. Defendant is entitled to summary judgment on this claim.

### II. State–Law Employment Contract Claim

 Plaintiff's principal claim arises under the Michigan common law of just-cause employment contracts. The Michigan Supreme Court has recently summarized its jurisprudence in this area in *Lytle v. Malady*, 456 Mich. 1, 566 N.W.2d 582 (1997). The court reiterated its previous holding that contracts for permanent employment are for an indefinite period of time and are presumptively construed to provide employment at will. *Id.*, 566 N.W.2d at 589 (citing *Rowe v. Montgomery Ward & Co. Inc.*, 437 Mich. 627, 473 N.W.2d 268, 271 (1991)) The Court identified the circumstances where this presumption can be overcome.

> A contract for just-cause employment may be established in three ways. First, it may be formed by an "explicit" promise. Second, it may be "manifested by the words or other conduct" of the parties assenting to the agreement. Third, it may be "implied by law" because the employer's statement regarding its "policies and procedures instill[ed][a] 'legitimate expectation[ ]' of job security in [the] employees."

*Lytle,* 566 N.W.2d at 589 (citations omitted). In the present case, as in most, plaintiff has no express, written employment contract. Therefore, his claim of wrongful discharge under Michigan law must fit within one of two alternate theories: an "implied contract theory" or a "legitimate expectation theory." *See Rood v. General Dynamics Corp.*, 444 Mich. 107, 507 N.W.2d 591, 598 (1992).. "While the first theory is grounded solely on contract principles 'relative to the employment setting,' the second theory is grounded solely on public policy considerations." *Rood,* 507 N.W.2d at 598 (quoting *Rowe,* 473 N.W.2d at 269).

### Contract Theory

 The Michigan Supreme Court has recognized the difficulty in verifying oral promises, especially in the employment context, because individuals often harbor optimistic hope of a long relationship that causes them to misinterpret their employer's oral statements as manifestations of an intention to undertake a commitment in the form of a

promise of security. The court requires that oral contracts regarding job security will be recognized "only where circumstances suggest both parties intended to be bound." *Rowe*, 473 N.W.2d at 271. "[A]ny orally grounded contractual obligation for permanent employment 'must be based on *more than* an expression of an optimistic hope of a long relationship.'" 473 N.W.2d at 273 (quoting *Carpenter v. American Excelsior Co.*, 650 F.Supp. 933, 936 n. 6 (E.D.Mich. 1987)). "Oral statements of job security must be clear and unequivocal to overcome the presumption of employment at will." 473 N.W.2d at 275.

■■■■ "In determining whether a reasonable fact finder can find a promise of job security implied in fact, we look to all the facts and circumstances to evaluate the intent of the parties." 473 N.W.2d at 273. "In deciding whether there was mutual assent to a just-cause provision, we must use an objective test, looking to the expressed words of the parties and their visible acts." *Id.; see also Kunz v. United Food & Commercial Workers*, 5 F.3d 1006, 1011 (6th Cir.1993). "The starting point in analyzing oral statements for contractual implications is to determine the meaning that reasonable persons might have attached to, the language, given the circumstances presented." 473 N.W.2d at 273.

■■■■ No rational trier of fact viewing the present record could ever conclude that plaintiff and Knoll entered into a just-cause contract based upon "clear and unequivocal" promises of job security. In fact, the uncontested facts are to the contrary. By plaintiff's own testimony, no one promised him any particular job security at the time his employment contract was formed, either when he was hired temporarily or given permanent employment (Plf. Dep. at 72–76, 78–80). Instead, plaintiff places great emphasis on vague assurances given him long after the employment contract was formed, especially statements by Leendert Ringlever. Ringlever, in reviewing the affidavit drafted on the stationery of plaintiff's counsel (docket # 28, Ex. D), refused to sign the affidavit as tendered, because it stated that he gave plaintiff

certain assurances when plaintiff was hired. Instead, Ringlever was careful to add by hand that his statements to plaintiff were made "later on," that is, not at the time of contracting (¶ 4). He later submitted a clarifying affidavit (docket # 32) expressly averring that he made no such statements during the hiring process and that his assurances came later, in casual conversation. Likewise, the deposition passages of supervisory personnel that plaintiff relies upon (*e.g.*, Campbell, at 47–48) relate to a time after hiring, during which plaintiff expressed insecurity and was assured in general terms that he was doing a good job. The present record is completely devoid of evidence of a promise, or even vague assurance, of just-cause employment *at the time of contracting*.

■■■■ The issue for this court, therefore, is whether a plaintiff may base a just-cause claim upon supervisor's vague statements or assurances made long after the employment contract is formed. I conclude that the answer must be "no," as plaintiff's contentions are not supported by Michigan cases decided under the "contract" theory of just-cause employment.[2]

The seminal case in the area of implied just-cause contracts is *Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich. 579, 292 N.W.2d 880 (1980). In that case, both plaintiffs (Toussaint and Ebling), claimed just-cause contracts based upon statements made at the time of hiring or during pre-hiring negotiations. Despite this fact, subsequent cases expanded the analysis, and some plaintiffs were successful in creating triable issues of fact by alleging *post-employment* oral assurances that they would be employed as long as they did a good job. *See, e.g., McDonald v. Union Camp. Corp.*, 898 F.2d 1155 (6th Cir.1990); *Brewster v. Martin–Marietta Alum. Sales, Inc.*, 145 Mich.App. 641, 378 N.W.2d 558 (1985) The reading of an enforceable contract into statements of this type came to a halt with *Rowe v. Montgomery Ward & Co.*, 437 Mich. 627, 473 N.W.2d 268 (1991). Mrs. Rowe was told at the time of her hiring that she would have a job as long as she met her

---

2. By contrast, the "reasonable expectation" theory, discussed below, can conceivably be supported by post-hiring policy statements by the employer.

sales quota. To determine whether this statement could be deemed part of the contract, the court applied general principles applicable to contracts implied-in-fact, which counsel an objective approach examining all facts and circumstances surrounding the act of contracting. 473 N.W. 2d at 273. The principal circumstance examined by the *Rowe* court was the existence and content of pre-employment discussions and negotiations concerning job security. Pointing to the lack of evidence that Rowe had inquired about job security during the contracting process, the court found that the supervisor's general statements about job security, even though made at the time of hiring, could not reasonably be relied upon as creating enforceable obligations. *Id.* at 273–74.

 After *Rowe*, a plaintiff seeking to establish a just-cause agreement based upon a contract theory (as opposed to a reasonable expectation theory), must establish the existence of the alleged agreement under legal principles generally applicable to contracts implied-in-fact. *See Rood v. General Dynamics Corp.*, 444 Mich. 107, 507 N.W.2d 591, 598 (1993). At a minimum, plaintiff is required to prove "clear and unequivocal" employer promises made at the time the contract was formed. Consequently, since *Rowe*, the Michigan courts have rejected contract-based claims resting upon assurances made long after the employment relationship was formed. *Compare Prysak v. R.L. Polk Co.*, 193 Mich.App. 1, 483 N.W.2d 629, 633 (1992) (assurances that employee would not be fired "for no reason" not adequate, because too vague and not made in circumstances, such as pre-hire negotiations, that would satisfy *Rowe*) *and Brocklehurst v. PPG Indus.*, 836 F.Supp. 1354, 1360 (E.D.Mich.1993) (statement that "No one gets fired at PPG" insufficient under *Rowe* because of lack of negotiations covering job security before hiring) *with Barnell v. Taub-*

*man Co.*, 203 Mich.App. 110, 512 N.W.2d 13, 17 (1993) (specific promises made during job interviews sufficient).[3]

Mr. Cole's case falters on both post-*Rowe* criteria. First, the assurances of job security (assuming they were made) came long after the time of contracting. Plaintiff's own deposition leaves no doubt that he did not inquire into job security at or before the time of hiring and that no assurances of any kind arose during the hiring process. The same lack of evidence concerning pre-hiring discussions led the *Rowe* court to reject a contract-based claim. 507 N.W.2d at 273–74. If, as taught by *Rowe*, the court is to be guided by general contract principles, comments made long after the contract was formed would appear irrelevant to discerning the intent of the contracting parties.

Second, the alleged comments of plaintiff's supervisors, whether considered singly or *en masse*, do not remotely approach the "clear and unequivocal" standard of Michigan law. Plaintiff points to supervisor's statements all made in response to his requests for assurance, such as: "He was doing fine workwise." (Campbell Dep. at 47–48); "Don't worry about it, you're doing a fine job. You've really got to screw up here at Knoll to get let go." (Plf. Dep. at 180); and "As long as he did his job adequately, he'd be alright." (Ringlever Aff., ¶ 8). These vague assurances are precisely the type of statement found insufficient in recent Michigan case law. For example, in its recent *Lytle* decision, the court found the following assurances to be insufficient to overcome the presumption of at-will employment: "You do a good job. You're very secure here. We'd like you to stay for long-term employment." 566 N.W.2d at 590. In *Rood*, plaintiff Schippers had sought assurances of job security in connection with a transfer. He was told that "unless something was really wrong he would

---

**3.** The Eastern District has held, in a post-*Rowe* decision, that oral representations need not be made *at the time of hiring in order to create* an enforceable contract. *Murphy v. Birchtree Dental, P.C.*, 964 F.Supp. 245, 248 (E.D.Mich.1997). I decline to follow *Murphy*, as it displays a misunderstanding of Michigan law. *Murphy* does not faithfully apply *Rowe's* requirement that such claims be analyzed by principles governing contracts implied-in-fact, under which statements made long after the time of contracting would appear virtually irrelevant. Furthermore, the *Murphy* court conflates the analysis of contract-based claims with those based on "reasonable expectations" created by employer policies. 964 F.Supp. at 248. I do not believe that the Michigan Supreme Court would hold that an employment contract, clearly at-will at its inception, can be transformed to a just-cause agreement months later by random assurances from a supervisor.

be there for retirement" and "as long as the division had a truck, [you] would be the driver." Plaintiff Rood was told "your job is fine, it's secure." 507 N.W.2d at 600, 605. Neither set of representations was found sufficient. Finally, the *Rowe* court held, as a matter of law, that similarly vague assurances could not give rise to contract rights. 473 N.W.2d at 274 ("As long as I sold, I would have a job at Montgomery Ward."). The Sixth Circuits post-*Rowe* decisions have also emphasized the substantial hurdle plaintiffs face in attempting to satisfy Michigan's requirement of a "clear and unequivocal" promise at the time of contract formation. In *Kunz,* statements during an initial employment interview that, "You joined the union. You are backed by the Union ... that you had the job as long as you wanted it," were insufficient to create any triable issue as "the alleged promise was not made in the context of specific contractual negotiations over a just-cause provision, but was merely the subject of a casual comment during the course of an interview." 5 F.3d at 1011. *See also, Wilson v. Wells Aluminum Corp.,* No. 95–2003, 1997 WL 52921, at * 2 (6th Cir. Feb.7, 1997); *Mitchell v. White Castle Systems, Inc.,* No. 94–1193, 1996 WL 279863, at * 4 (6th Cir. May 24, 1996); *Bailey v. Dover Elevator Co.,* No. 93–1493, 1994 WL 198194, at * (6th Cir. May 19, 1994).

No properly instructed jury could ever return a verdict for plaintiff under the "contract" theory of just-cause employment contracts. Defendant is therefore entitled to summary judgment on this prong of plaintiff's *Toussaint* claim.

### Legitimate Expectations Theory

Plaintiff asserts the alternative claim that he had a legitimate expectation of just-cause employment under Michigan law. "[T]he legitimate expectations theory of *Toussaint* is not based on traditional contract analysis. The rationale for Judicial enforcement of employer policies and procedures relating to employee discharge is simply the intuitive recognition that such policies and procedures tend to enhance the employment relationship and encourage an orderly cooperative and loyal work force for the ultimate benefit to the employer." *Rood,* 507 N.W.2d at 606. In *Toussaint* and its progeny, the Michigan courts have discerned such employ-

er policies from employee manuals and handbooks disseminated to the work force at large. The state supreme court has identified the "presence of clear and specific employer policy statements, regarding employee discharge" as the "common thread" running through its decisions in the "reasonable expectations" area. *Rood,* 507 N.W.2d at 607; *see Dolan v. Continental Airlines,* 454 Mich. 373, 563 N.W.2d 23, 29–30 (1997) (The legitimate expectations theory "operates as a viable, independent basis for enforcing promises of job security contained in policy statements that are circulated either to the work force in general or to specific classifications of the work force, rather than to an individual employee."). Consequently, this theory focuses on generally applicable policy statements rather than individual representations. *See Rood,* 507 N.W.2d at 606.

In the present case, it is undisputed that Knoll did not provide plaintiff with any employee handbook, policy statement, discipline policy or other publication addressing employee discharge. This should be, and is, the death knell for plaintiffs "reasonable expectation" theory. *See Prysak,* 483 N.W.2d at 632 (no possible legitimate expectation of termination only for just cause where plaintiff's deposition testimony established that he did not ever recall receiving an employee manual nor was he aware of its contents). Plaintiff continues to assert his claim, however, arguing that he should prevail because of the *lack* of a policy statement explicitly creating at-will employment. (Plf. Brief, docket # 28, at 8–9). This argument stands the law on its head. Employment is presumptively deemed to be at-will, unless this presumption is rebutted by clear and unequivocal evidence to the contrary. *Rood,* 507 N.W.2d at 607. If it means anything, this rule of law means that silence by the employer must lead to a conclusion of at-will employment. Plaintiff would reverse the presumption, requiring an affirmative policy statement to negate a presumption of good-cause employment. This proposition is directly contrary to Michigan law. Although a clear policy statement of at-will employment will generally provide the employer with a complete defense, *see, e.g., Rowe,* 473 N.W.2d at 276–77; *Vollrath v. Georgia–Pacific Corp.,*

899 F.2d 533 (6th Cir.), *cert. denied,* 498 U.S. 940, 111 S.Ct. 345, 112 L.Ed.2d 310 (1990), the absence of the defense in no way proves the plaintiff's case. It is not surprising, therefore, that the Michigan courts have pointedly rejected the very argument plaintiff now advances.

We do not find it to be of any moment that the manual may not have explicitly stated that employment was at-will and that termination was not limited to those instances where just cause is shown. As stated above, the presumption is that employment is at-will, and the proper inquiry is whether the employer, through its employment manual or otherwise, made representations or promises that termination would be only for just cause.

*Biggs v. Hilton Hotel Corp.,* 194 Mich.App. 239, 486 N.W.2d 61, 62 (1992).

■ Plaintiff also points to testimony of supervisory personnel concerning practices preceding a termination. Philip Baker, for example, testified that if a person is not doing his job, "we give them an opportunity to correct the situation; and if they don't, they're terminated." (Baker Dep. at 41). Antoinette Campbell testified that she knew of no particular policy or procedure governing termination of non-hourly employees (Campbell Dep. at 67). Sometimes supervisors were given a chance to fix their problems before they were terminated, but sometimes they were fired immediately (*Id.,* 486 N.W.2d at 66–67).

This "evidence" of a progressive disciplinary practice, contradictory as it is, fails to create a jury submissible issue, as a matter of law. The Michigan Supreme court has recently reaffirmed the principle that a just-cause contract may not be inferred from the existence of a probationary period or even from an *express* disciplinary procedure. *Dolan v. Continental Airlines,* 454 Mich. 373, 563 N.W.2d 23, 29 (1997). To hold otherwise would create a perverse incentive for employers to treat their workers arbitrarily and to afford no one a second chance, lest some employee presume a lifetime employment contracts. As the Michigan Court of Appeals stated in an earlier case cited by the *Dolan* court:

The fact that defendant had established a disciplinary system for its employees and, apparently, obligated plaintiff to abide by that disciplinary system in dealing with his subordinates does not establish unequivocally plaintiff's position that he was a just-cause employee rather than an at-will employee. Certainly, it is not unreasonable to expect that an employer, particularly one such as defendant that employs a large number of individuals, would want a systematic method of dealing with its employees and would provide a consistent set of guidelines under which its managers would deal with subordinates. This does not mean that by doing so an employer establishes just-cause employment rather than at-will employment.

*Biggs v. Hilton Hotel Corp.,* 194 Mich.App. 239, 486 N.W.2d 61, 62 (1992); *accord, Grant v. Rockwell Int'l Corp.,* 811 F.2d 605, 1986 WL 18452 (6th Cir.1986). *Brocklehurst v. PPG Indus.,* 836 F.Supp. 1354, 1360 (E.D.Mich.1993); *Rowe,* 473 N.W.2d at 275 (existence of just-cause contract would not be inferred from existence of written disciplinary system); *Stopczynski v. Ford Motor Co.,* 200 Mich.App. 190, 503 N.W.2d 912, 914 (1993). If the existence of a formal disciplinary system is insufficient to raise an inference of just-cause employment, the vague evidence in the present case of a practice "sometimes" to give employees a second chance fails to support plaintiff's claims as a matter of law.

Plaintiff's claim of a good-cause employment contract is based upon a concatenation of discredited and unsupportable legal arguments. The record is devoid of any evidence of a clear and unequivocal promise to him personally, or of policy statements made to employees generally, raising a reasonable inference of just-cause employment. Plaintiff has failed to raise a jury submissible issue of fact in support of either a contract theory or reasonable expectation theory under Michigan law. Defendant is therefore entitled to summary judgment on all aspects of plaintiff's common-law claim of a just-cause employment contract.

### III. Elliott–Larsen Civil Rights Act

■ Plaintiff, a white male, contends that his termination was motivated by race

and sex discrimination, in violation of the Michigan Elliott–Larsen Civil Rights Act. MICH. COMP. LAWS §§ 37.2201, *et seq.* Although generally patterned after Title VII, the Elliott–Larsen Act does not require a claimant to exhaust administrative remedies as a prerequisite to suit. *See Walters v. Department of Treasury,* 148 Mich. App. 809, 385 N.W.2d 695, 698 (1986); *Constantinoff v. Emma L. Bixby Hosp.,* 111 Mich.App. 575, 314 N.W.2d 698 (1982). Plaintiff may therefore pursue an Elliott–Larsen claim despite his admitted failure to bring an administrative charge.

■■■■■ The Elliott–Larsen Act prohibits workplace discrimination on the basis of a number of specified grounds, including race, sex, religion and age. MICH. COMP. LAWS § 37.2202. The Michigan Court of Appeals, turning to Title VII cases as persuasive precedent, has recently articulated the requirements for a showing of *prima facie* case by a plaintiff, such as Mr. Cole, who claims "reverse discrimination."

Accordingly, we hold that a reverse discrimination plaintiff who has no direct evidence of discriminatory intent may establish a prima facie claim of gender discrimination under the Civil Rights Act with respect to a promotion decision by showing (i) background circumstances supporting the suspicion that the defendant is that unusual employer who discriminates against men; (ii) that the plaintiff applied and was qualified for an available promotion; (iii) that, despite plaintiffs qualifications, he was not promoted; and (iv) that a female employee of similar qualifications was promoted. Upon this showing, a "presumption" of discriminatory intent is established for possible rebuttal by the employer. Absent this showing, a reverse discrimination plaintiff who has no direct evidence of discriminatory intent cannot proceed.

*Allen v. Comprehensive Health Services,* 222 Mich.App. 426, 564 N.W.2d 914, 917 (1996).

Plaintiff has utterly failed to establish a prima facie case under this standard. The record is devoid of any "background circumstances" supporting a suspicion that Knoll is one of those rare employers that discriminates against young, white males. Plaintiff has presented no evidence of any pattern of discrimination by Knoll against white men in hiring, promotion, discipline or termination.

Instead, plaintiff presents a dishonorable argument to the effect that Knoll discriminated against plaintiff by favoring his black, female accuser over him. (Brief, docket # 28, at 14–15). According to plaintiff's accusation, plaintiff "was discriminated against so that Knoll would not have to fight the frivolous claims of a black woman." (*Id.,* at 14). The apparent thrust of this argument is that the court should presume discrimination whenever an employer believes the contentions of a minority worker and disciplines a non-minority.[4] Although plaintiff cites neither law nor facts in support of this argument, he assures the court that the "real reason" for his firing, will be "easily understood by a West Michigan jury." (*Id.*).

This court sincerely trusts that no West Michigan jury would fall prey to a discrimination claim founded solely upon the races of the employees involved in a work place dispute. But the duties of a judge determining a summary judgment motion require the screening of legally and factually unsupported claims, precisely to avoid the chance that a jury will be swayed by irrelevancies or specious arguments. This is precisely such a case. Plaintiff has not presented any direct evidence of discriminatory intent, nor any proof that Knoll is "that unusual employer who discriminates against men." Absent this showing, a reverse discrimination plaintiff "cannot proceed." *Allen,* 564 N.W.2d at 917.

## IV. Promissory Estoppel

It is common for Michigan plaintiff asserting *Toussaint* claims to add a "throw-in" count asserting promissory estoppel. Plaintiff's Complaint is no exception. Count IV asserts a claim for promissory estoppel, alleging that plaintiff decided to buy a house in justifiable reliance upon assurances that he was doing a good job.

---

4. Plaintiff's argument conveniently ignores the fact that the discharge followed complaints by a number of workers, some of whom were not black.

 Promissory estoppel arises in equity when (1) a person makes a promise (2) that the promiser should reasonably have expected to induce action of a definite and substantial character on the part of the promisee (3) which in fact produced reliance or forbearance of that nature and (4) circumstances require enforcement of the promise to avoid injustice. *See Meerman v. Murco, Inc.,* 205 Mich.App. 610, 517 N.W.2d 832, 835 (1994) The Michigan courts apply the doctrine of promissory estoppel cautiously. *Marrero v. McDonnell Douglas Capital Corp.,* 200 Mich.App. 438, 505 N.W.2d 275, 278 (1993). In order to support a claim of estoppel, a promise must be "definite and clear." *Kamalnath v. Mercy Memorial Hosp. Corp.,* 194 Mich.App. 543, 487 N.W.2d 499 (1992).

 Plaintiff's promissory estoppel claim fails on two distinct grounds. First, he cannot point to any promise whatsoever that meets the "definite and clear" requirement of Michigan law. The Michigan courts require a high level of specificity in this area, just as they do in the area of just-cause employment contracts. Consequently, vague statements too indefinite to support a *Toussaint* claim will likewise fail to support a promissory estoppel claim. *Barber v. SMH (US), Inc.,* 202 Mich.App. 366, 509 N.W.2d 791 (1993), is instructive. Plaintiff in the *Barber* case asserted breach of an implied just-cause contract arising from alleged assurances during his interview that "as long as I was profitable and doing the job for defendant, I would be defendant's exclusive representative ..." 509 N.W.2d at 794. The Michigan Court of Appeals, applying *Rowe,* found that this alleged statement was not sufficient to overcome the presumption of at-will employment. Likewise, the alleged promise was found insufficient to meet the law's requirement of a "definite and clear" promise, for purposes of plaintiff's promissory estoppel claim. *Id. 509 N.W.2d* at 796. The court cautioned that the doctrine of estoppel should be applied "only where the facts are unquestionable and the wrong to be prevented undoubted." *Id.* On this basis, the court affirmed a summary judgment for the defendant.

 Second, the nature of plaintiffs alleged reliance is insufficient under Michigan law to raise an estoppel. The Michigan courts are aware that most people make major life decisions—purchase of a home, purchase of an automobile, charitable commitments and the like—on the assumption that they will remain employed. Consequently, the courts are cautious in allowing plaintiffs to point to such "customary and necessary" incidents of life as the basis for equitable estoppel. *Marrero,* 505 N.W.2d at 278 For example, in *Marrero v. McDonnell Douglas,* the Court of Appeals held that resignation from a job and relocation were insufficient to support a promissory estoppel claim. 505 N.W.2d at 278. Likewise, the plaintiff in *McMath v. Ford Motor Co.,* 77 Mich.App. 721, 259 N.W.2d 140, 142–43 (1977), was unsuccessful in pressing a promissory estoppel claim, even though he resigned from military service at the request of the employer. Successful assertion of an estoppel claim has required much clearer promises and more substantial reliance. *See, e.g., Lovely v. Dierkes,* 132 Mich.App. 485, 347 N.W.2d 752 (1984) (relinquishment of two other jobs, relocation of family, offer of definite salary for definite time, promise of ownership in company, and promise to reduce agreement to writing were sufficient to estop defendants).

Oral assurances too vague to support a *Toussaint* claim are, *a fortiori,* insufficient to create a promissory estoppel. Plaintiff has failed to establish a jury submissible issue, and defendant will be granted a summary judgment on the estoppel claim.

**V. Defamation**

Count V asserts a slander claim, and count VI alleges libel. The slander claim is based upon repetition by unnamed management employees of allegedly false accusations of sexual harassment. The alleged libel arises from the preparation of an investigatory report by supervisor Antoinette Campbell, one page of which plaintiff found lying on the floor. (Plf. Dep. at 152–54 and Dep. Ex. 5). Plaintiff devotes a scant eight sentences in his brief opposing the summary judgment motion to his claims of libel, slander, and intentional infliction of emotional distress. He cites no law and no record facts support of these claims. Consequently, the court

hesitates to dignify these unsupported claims with extended discussion.

 Under Michigan law, the elements of a defamation claim are (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault, amounting to at least negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by publication. *Northland Wheels Roller Skating Center, Inc. v. Detroit Free Press, Inc.*, 213 Mich. App. 317, 539 N.W.2d 774, 777 (1995); *see also Deflaviis v. Lord & Taylor, Inc.*, 223 Mich.App. 432, 566 N.W.2d 661, 667 (1997); *Bowers v. Reutter*, 951 F.Supp. 666, 672 (E.D.Mich.1997). These elements must be specifically pleaded and proved, including specific proof with respect to the defamatory words, the connection between the plaintiff and the defamatory words, and publication. *Gonyea v. Motor Parts Federal Credit Union*, 192 Mich.App. 74, 480 N.W.2d 297, 299 (1991); *see also Lawrence v. Syms Corp.*, 969 F.Supp. 1014, 1019–1020 (E.D.Mich.1997).

 Plaintiff has not established a triable issue of fact with regard to any element of his libel or slander claims. His assertions of oral defamation or slander, remain vague. He cannot pinpoint any particular statement made by any particular supervisory employee, but merely asserts that rumors of his alleged sexual harassment were circulating in the work place. This is insufficient. With regard to the alleged libel, he has not established that any of the contents of Ms. Campbell's investigatory memorandum were false or defamatory. In fact, he has not established the contents of that memorandum at all. Furthermore, plaintiff has no proof that the allegedly defamatory writing was published, that is, divulged to a third party, by being left on the shop floor.

 In addition, plaintiff has not established that the statements, whatever they were, were unprivileged. Michigan law has long recognized that an employer has the qualified privilege to defame an employee by making statements to other employees whose duties interest them in the subject matter. *See, e.g., Bostetter v. Kirsch Co.*, 319 Mich. 547, 30 N.W.2d 276 (1948); *Gonyea*, 480

N.W.2d at 300. The courts recognize this privilege because employers are obviously required to discuss and investigate allegations of wrongdoing by their employees. Supervisory employees have an undoubted need to comment to each other on the qualifications, morals, and work habits of employees. *See Beaumont v. Brown*, 401 Mich. 80, 257 N.W.2d 522, 527 (1977), *overruled in part on other grounds, Bradley v. Saranac Community Schools Bd. of Educ.*, 455 Mich. 285, 565 N.W.2d 650, 658 (1997) ("Beaumont v. Brown, which plaintiffs argue prevents the release of the requested documents under the common-law right of privacy, is overruled to the extent that conflicts with the FOIA."). Consequently, the Michigan courts presume that such discussions are done in good faith and with proper motive. *Raymond v. Croll*, 233 Mich. 268, 206 N.W. 556, 557 (1925). Under these authorities, statements to fellow employees, union officials, and others interested in the operation of the work place enjoy a qualified privilege, even if they are untrue. *See Merritt v. Detroit Mem. Hosp.*, 81 Mich.App. 279, 265 N.W.2d 124, 126–27 (1978) ("Employers responsible for hiring and firing are entitled to hear accusations of employee misconduct which warrant dismissal and preclude the hiring.").

 Plaintiff's subordinates made serious accusations against him, including improper touching, sexual harassment, and violation of company rules. These charges, whether true or false, were serious, and defendant was required by law to investigate them. *See Blankenship v. Parke Care Centers*, No. 96–3084, 1997 WL 475867, at * 3 (6th Cir. Aug.22, 1997) (employer required by Title VII to take prompt and effective measures in response to sexual harassment claims). Defendant's supervisory employees were privileged to discuss these allegations, to make appropriate inquiries, and to commit their findings to writing. Plaintiff has adduced no evidence to overcome the qualified privilege created in these circumstances by Michigan law.

For the foregoing reasons, defendant will be granted a summary judgment on plaintiff's defamation claims.

## VI. Intentional Infliction of Emotional Distress

Count VII of the complaint contains a claim for the intentional infliction of emotional distress. Plaintiff asserts that he suffered severe emotional distress as a result of unspecified conduct by his supervisors. When defendant's motion for summary judgment challenged the sufficiency of plaintiff's proofs to support this claim, his brief devoted a single paragraph, devoid of citations to Michigan law, to this tort claim. (Plf. Brief, docket # 28, at 16).

The seminal case in this area is the Michigan Supreme Court decision in *Roberts v. Auto–Owners Ins. Co.*, 422 Mich. 594, 374 N.W.2d 905 (1985). In *Roberts*, the Michigan Supreme Court expressly declined to recognize the tort of intentional infliction of emotional distress. 374 N.W.2d at 908 n. 6. It was unnecessary for the court to reach the question, because plaintiff in that case had failed to establish the minimum showing of proof required to withstand a motion for directed verdict. *Id.* at 908. The court went on to establish, however, two important propositions for subsequent jurisprudence.

First, the *Roberts* court held that in a contractual setting, a tort action for the intentional infliction of emotional distress "must rest on a breach of duty distinct from contract." 374 N.W.2d at 909. Wrongful discharge claims brought under a *Toussaint* theory are contractual in nature. Consequently, following *Roberts*, numerous courts applying Michigan law have held that allegations of wrongful discharge from employment cannot support a claim for the intentional infliction of emotional distress, as a matter of law *See Haywood v. Schwan's Sales Enterprise, Inc.*, No. 96–1439, 1997 WL 188463, at * 3 (6th Cir. April 16, 1997); *Kovacs v. Electronic Data Sys. Corp.*, 762 F.Supp. 161, 167 (E.D.Mich.) (Suhrheinrich, J.), *aff'd.*, 929 F.2d 701, 1991 WL 43936 (6th Cir.1991); *Stopczynski v. Ford Motor Co.*, 200 Mich. App. 190, 503 N.W.2d 912, 915 (1993);*Khalifa v. Henry Ford Hosp.*, 156 Mich.App. 485, 401 N.W.2d 884. 891 (Mich.App.1986). In the present case, plaintiff does not allege any conduct beyond wrongful termination. Under these authorities, therefore, his tort claim would be precluded as a matter of law.

Second, the *Roberts* court determined that the elements of this tort, if it were to be recognized, are those set forth in the RESTATEMENT OF TORTS, 2d, § 46:(1) "extreme and outrageous" conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress. 374 N.W.2d at 908 (citing *Ross v. Burns*, 612 F.2d 271, 273 (6th Cir.1980)). In numerous cases thereafter, the Michigan Court of Appeals has applied this holding, determining that liability for such a tort claim may be found "only where the conduct complained of has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Johnson v. Wayne County*, 213 Mich.App. 143, 540 N.W.2d 66, 74 (1995). It is impossible to find conduct in the present case that remotely approaches this definition. The Michigan courts have recognized only truly egregious conduct as fitting this narrow definition For example, in *Johnson*, the court reversed a summary judgment for defendant, where the plaintiff (a juror who had just voted to convict a mass murderer) was locked in a cell with the murderer and mocked by guards. 540 N.W.2d at 74. By contrast, the work place setting rarely, if ever, gives rise to such actionable conduct. The Sixth Circuit has expressed doubt whether the tort applies at all in the context of termination from employment *Rush v. United Technologies*, 930 F.2d 453, 456–57 (6th Cir.1991). If it does apply, the tort would require far more than a mere termination from employment, even if wrongful or malicious. *Id.; see Novosel v. Sears, Roebuck & Co.*, 495 F.Supp. 344, 347 (E.D.Mich.1980); 480 N.W.2d at 300–01 (summary discharge not actionable as a tort, even if it leads to understandable emotional distress). Certainly, when the employer acts within its rights in dismissing an at-will employee, no tort claim is even arguable. *See Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 462 (6th Cir.1986). Plaintiff has neither alleged nor proved any "utterly intolerable" conduct by defendant.

Plaintiff's assertion of a claim for the intentional infliction of emotional distress in these circumstances borders on the frivolous. Defendant is clearly entitled to a summary

judgment, this court finding that plaintiff has failed to adduce even a scintilla of proof to support this tort claim.

### VII. Loss of Consortium

Mrs. Cole asserts a loss of consortium claim in Count VII. "A derivative claim for loss of consortium stands or falls on the primary claims in the complaint." *Long v. Chelsea Community Hosp.*, 219 Mich.App. 578, 557 N.W.2d 157, 162–63 (1996); *see also Cavalier v. Werner Co.*, 976 F.Supp. 672, 1997 WL 530871, at * 6 (E.D.Mich. 1997); *Moss v. Pacquing*, 183 Mich.App. 574, 455 N.W.2d 339, 343 (1990). The court having found Mr. Cole's claims to be meritless, Mrs. Cole's consortium claims must likewise fail.

### *Conclusion*

For the foregoing reasons, defendant's motion for summary judgment will be granted in its entirety.