**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0545n.06

**No. 10-1408**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

**Aug 08, 2011**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| G. SCOTT WHITING, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| ALLSTATE INSURANCE CO., | ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellee. | ) | |

Before: SUTTON and COOK, Circuit Judges; GREER, District Judge.[*]

SUTTON, Circuit Judge. Scott Whiting, a former employee of Allstate Insurance Company, challenges the dismissal of his defamation claim. Because businesses have a qualified privilege to communicate about their employees, this claim fails as a matter of law.

I.

Whiting began working for Allstate in 1986 as a support staff member and over the years earned several promotions. During his tenure, Whiting received many favorable reviews and several awards for his service.

---

[*]The Honorable J. Ronnie Greer, United States District Judge for the Eastern District of Tennessee, sitting by designation.

At the heart of Whiting's complaint is an insurance-claims practice known as "managed disposition," by which some Allstate offices allegedly regulated their monthly payout numbers by off-setting large claims against many smaller claims. At times, Whiting says, his supervisors instructed him to delay claims payments. At other times, they removed his authority to pay large claims at the end of the month, which also had the effect of delaying payments.

On June 27, 2006, Whiting sent an email to Dennis Shelton, a claims adjuster in Indiana, authorizing him to pay a claim for more than $100,000 but telling him to delay the payment until after July 1. Shelton noted the delay in the customer's file.

In January 2007, an Allstate investigator contacted Whiting about the delayed claim payment. The investigator wrote a report discussing the email exchange with Shelton as well as notations in the files about Whiting's instructions to delay the payment.

After reviewing this report, Allstate in-house counsel Susan Rosborough asked Christi Rushing, a human resources manager, to fire Whiting. The discharge letter said that "Whiting instructed a remote adjuster to delay a claim payment with a significant dollar amount until after the end of the second quarter" of 2006 and concluded that "Whiting violated the Allstate Code of Ethics . . . by delaying payments on a claim." R.40-19 at 2. This behavior, the letter added, violated the following ethics provision:

> As one of Allstate's core values, integrity must be part of all business goals and
> activities. We treat every stakeholder accordingly. We act honestly and deal fairly
> and ethically with customers, suppliers, competitors and other employees.

R.40-19 at 3. According to the letter, the Allstate Human Resources Policy Guide recommended immediate discharge for offenses of this sort. Because Whiting had worked at Allstate for more than twenty years, the discharge letter required the signatures of three managers, each of whom reviewed this letter and signed it.

On June 11, 2007, Allstate fired Whiting, citing a breach of ethics.

On June 12, 2007, Whiting received a phone call from John Barrett, a property manager at the home office in Illinois, offering his condolences and relaying that he heard Whiting had been fired for a breach of ethics. Whiting received other phone calls over the next month from other employees and vendors who had heard about the firing.

Whiting filed this lawsuit against Allstate in Michigan state court, claiming defamation. Allstate removed the case to federal court based on diversity jurisdiction. 28 U.S.C. § 1332. At that point, Whiting added a wrongful termination claim to his complaint, and after discovery Allstate successfully moved for summary judgment on both claims. Whiting now appeals the dismissal of his defamation claim.

## II.

Under Michigan law, a statement is defamatory if it tends to harm the reputation of another by lowering the estimation of that person in the community or by deterring third parties from

associating with him.  *Smith v. Anonymous Joint Enter.*, 793 N.W.2d 533, 540 (Mich. 2010).

Among other elements of the claim, a plaintiff must establish that the defendant made an

*unprivileged* communication to a third party, *id.*, which presents a problem for Whiting:  The record

does not contain any unprivileged communication by Allstate to any third party about this discharge.

In his complaint, Whiting says that Harry Wright (Claim Field Director) and Dan Hebel

(Vice President of the Eastern Territory of Field Claims) "made statements regarding plaintiff which

said, directly or by implication, that [Whiting] had behaved in violation of Allstate's ethical

standards . . . [and] practices and policies."  R.35 ¶ 32.  Later in the complaint, Whiting mentions

"false statements made by Hebel, Wright and other Allstate employees," but he never identifies other

employees or statements.  R.35 ¶ 34.

Whiting's *brief* points to three defamatory statements involving six speakers.  Two of the

statements are included in the discharge letter:  that Whiting "violated the Allstate Code of Ethics"

and that he "violated company policy."  Whiting Br. 31–32.  The third is a general accusation that

Whiting was "verbally castigated" for having committed a breach of ethics because three Allstate

employees (Susan Rosborough, in-house counsel; Christi Rushing, human resources manager; Luke

Yang, internal investigator) spoke to each other and with Whiting about the internal investigation.

*Id.* at 32.

There is some reason to doubt whether Whiting's pleading suffices to bring into play the

statements mentioned in his briefs.  *See Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434,

436 (6th Cir. 1988) ("complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory"); *cf. Gonyea v. Motor Parts Fed. Credit Union*, 480 N.W.2d 297, 299 (Mich. Ct. App. 1991) (a claimant must plead the elements of a defamation claim with specificity, including the allegedly defamatory words, the connection between the words and the plaintiff and their publication). Even if we overlook this potential pleading deficiency, none of the statements referenced in the complaint *or* briefs satisfies the prerequisites of an unprivileged defamatory statement.

Under Michigan law, as under the law of most (if not all) States, employers have a qualified privilege "to defame an employee by making statements to other employees whose duties interest them in the subject matter." *Id*. at 300. Supervisory employees frequently have the need, sometimes the duty, to comment on the behavior and work habits of their charges. *See Beaumont v. Brown*, 257 N.W.2d 522, 527 (Mich. 1977); *Cole v. Knoll, Inc.*, 984 F. Supp. 1117, 1134 (W.D. Mich. 1997). Consistent with the imperatives of managing a company, to say nothing of common sense, supervisory employees thus may "discuss . . . allegations, . . . make appropriate inquiries, and . . . commit their findings to writing" without violating the defamation laws. *Id.* How else could one run a company? "Employers responsible for hiring and firing" must be able "to hear accusations of employee misconduct which warrant dismissal" and deal with them appropriately—which often includes further communications with other supervisors and employees. *Merritt v. Detroit Mem'l Hosp.*, 265 N.W.2d 124, 126–27 (Mich. Ct. App. 1978).

This privilege covers all of the targeted statements. Each statement concerns Whiting's behavior as an Allstate employee—his instruction to a claims adjuster to delay payment on an authorized claim. And each of the speakers was a supervisory employee involved in the investigation and discussion of Whiting's behavior. Three of the employees—Yang, Rosborough and Rushing—were directly responsible for overseeing the behavior of employees and for participating in the investigation and documentation of misbehavior. The other three—Hebel, Wright and Karleen Zuzich—were executive managers who oversaw Whiting and other employees like him. All six employees had an interest in Whiting's conduct on the job, and their positions required them to investigate this incident and decide whether it required his firing. The privilege thus covers their conversations and written communications.

The privilege, we recognize, is not without limits. It does not extend to defamatory communications made to other employees who are not supervisors but "simply fellow employees in the identical work" as the person defamed. *Sias v. Gen. Motors Corp.*, 127 N.W.2d 357, 360 (Mich. 1963); *see also Patillo v. Equitable Life Assurance Soc'y*, 502 N.W.2d 696, 699–700 (Mich. Ct. App. 1993); *Horton v. 48th Dist. Court*, 446 F. Supp. 2d 756, 765 (E.D. Mich. 2006). In Whiting's case, however, all six of the relevant employees had supervisory roles. *See Cole*, 984 F. Supp. at 1134.

Whiting insists that the supervisory employees violated the privilege by disseminating the defamatory documents to lower-level employees. But no evidence supports this claim. "[R]umors . . . circulating in the work place" by themselves do not suffice to establish a triable issue of fact in

a defamation claim, *id.*, especially when Whiting admits that he "[doesn't] know who" originated the rumors and that only one person mentioned the code of ethics to him. R.40-4 at 62, 76–77, 101.

A claimant, we also recognize, may overcome the privilege by showing actual malice—that the supervisor made the defamatory statement with "knowledge of its falsity or reckless disregard of the truth." *Gonyea*, 480 N.W.2d at 300. Whiting alleges that his supervisors knew that delaying claim payments was an accepted business practice at Allstate and contends that at least some of the supervisory employees "feigned ignorance" of the practice in their depositions. R.11 at 59–60.

The record, however, does not permit the inference that the six supervisory employees knew of any such practice within the Michigan office. Five of the supervisors worked in Allstate offices in other States and supervised the Michigan office from a distance. The sixth supervisor worked in the Michigan office but in the human resources department, a distinct division (physically and in terms of substantive responsibility) from the claims area where Whiting worked.

Two of the six supervisors reviewed only the termination request, which outlined Whiting's behavior and the relevant policy sections, but gave no indication that Whiting had told investigators that his behavior conformed with the instructions of his superiors and the practice in the Michigan office. The four other supervisors reviewed Yang's investigation report, which contained conflicting information—Whiting's statement that Lionel Beckles directed him to delay the claim payment and the contrary testimony of Beckles himself, who denied telling Whiting to delay a claim payment and who emailed the office's employees instructing them *not* to delay payments. At most, the Yang report reveals that Whiting heard one thing and Beckles testified he said something else. In

No. 10-1408
*Whiting v. Allstate Ins. Co.*

respecting one version of what was said, including the version supported by an office-wide email, the supervisors hardly showed knowledge of a falsity or for that matter any reckless disregard of the truth.

III.

For these reasons, we affirm.